Sanford P. Dumain
**MILBERG LLC**
100 Garden City Plaza
Garden City, New York 11530
Tel:    (212) 594-5300
sdumain@milberg.com

**WITTELS MCINTURFF PALIKOVIC**
Ethan D. Roman*
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel:    (914) 775-8862
edr@wittelslaw.com

**BRYSON HARRIS SUCIU & DEMAY PLLC**
Scott C. Harris*
900 W. MORGAN STREET
RALEIGH, NORTH CAROLINA 27603
Tel:    919-600-5003
sharris@brysonpllc.com

* *Pro Hac Vice Application Forthcoming*

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JOHN DADDABBO**, <br><br> on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **NORDVPN S.A., TEFINCOM S.A. D/B/A NORDVPN, AND LAGOSEC, INC.** <br><br> Defendants. | Civil Case No.: <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff John Daddabbo ("Plaintiff"), by his undersigned attorneys Milberg LLC, Bryson, Harris, Suciu, & Demay, PLLC, and Wittels McInturff Palikovic, brings this action in his individual capacity and on behalf of classes of consumers defined below against Defendants Nordvpn S.A., Tefincom S.A. d/b/a NordVPN (collectively, "Nord Security" or the "Nord Defendants") and Defendant Lagosec, Inc. ("Lagosec") (together with Nord Security, "Defendants"), and hereby alleges the following with knowledge as to his own acts and upon information and belief as to all other acts:

### INTRODUCTION

1.      This is a proposed class action lawsuit seeking to remedy a widespread billing fraud perpetrated by Nord Security and Lagosec, namely, Defendants' practice of unilaterally and without authorization reactivating customers' subscriptions for Nord Security's virtual private network and other services, and processing the resulting unauthorized charges.

2.      Nord Security offers a suite of products and services that claim to provide internet users with privacy and protection from cybersecurity threats. Those offerings include a virtual private network ("VPN") service called "NordVPN,"[1] a password manager called "NordPass," and an encrypted cloud storage service called "NordLocker." These products and services are referred to herein as the "Nord Subscriptions."

3.      Potential customers are directed to Nord Security's various sales websites through online searches, its sponsorship of influencers, or by advertising for the Nord Security's VPN

---

[1] A VPN service is one that purports to protect a user's internet connection and online privacy. These services typically route a user's internet traffic through an encrypted tunnel to a server in another location, masking the user's location and protecting the user's data from interception along the way. Uses for VPNs range from casual entertainment (i.e., using a VPN while abroad to watch a show that is only available in the U.S.) to the distribution of politically significant information (i.e., masking journalistic sources within a totalitarian regime).

and/or other services. Nord Security advertises widely online and on dozens of podcasts. Nord Security's advertising touts the benefits that its services allegedly offer the prudent consumer; for example, Nord Security claims that its VPN service provides consumers "safe and private access to the internet" and that it is "trusted by tech experts and users."

4.      After consumers enroll in Nord Security's privacy and security products and services and their Nord Subscriptions lapse, are canceled, or otherwise become inactive (i.e., future automatic renewal payments are no longer set to occur), unbeknownst to these consumers, Nord Security unilaterally reactivates Nord Subscriptions without the consumers' knowledge or authorization, and charge consumers for those reactivated subscriptions using the payment information Nord Security collected when consumers first enrolled.

5.      Nord Security's products are offered with a "negative option" feature, which the Consumer Financial Protection Bureau ("CFPB") defines as "a term or condition under which a seller may interpret a consumer's silence, failure to take an affirmative action to reject a product or service, or failure to cancel an agreement as acceptance or continued acceptance of the offer."[2] As the CFPB notes, "[n]egative option programs can cause serious harm to consumers," which "is most likely to occur when sellers mislead consumers about terms and conditions, fail to obtain consumers' informed consent, or make it difficult for consumers to cancel."[3]

6.      For those consumers whose accounts are unilaterally reactivated by Nord Security, they are then re-entered into Nord Security's negative option subscription model and are charged future recurring fees, despite not authorizing the Nord Subscription in the first place.

---

[2] Consumer Financial Protection Circular 2023-01, Unlawful negative option marketing practices (Jan. 19, 2023), https://files.consumerfinance.gov/f/documents/cfpb_unlawful-negative-option-marketing-practices-circular_2023-01.pdf.

[3] *Id*. at 2.

7.      These outcomes are the result of Defendants' intentional and bad-faith scheme to reactivate subscriptions to continue generating subscription fees. Defendants are well aware that their fraudulent billing scheme is tricking customers, as complaints about Nord Security are legion, with consumers complaining on sites like Trustpilot, SiteJabber, and Reddit or directly to Nord Security such as the following:





**David Evans**
GB · 2 reviews

Apr 7, 2025



**When you cancel you dont mean it....**

I had a subscription for a month in August which I cancelled and March this year they restarted.
They refused a refund and gave no reasonable explianation as to why it was restarted.

Dont go near them, total bunch of crooks.

March 5, 2025    Unprompted review

👍 Useful    ⌁ Share    ⚑

**David N Tate**
GB · 10 reviews

Updated Apr 18, 2024



**Not at all happy with this company**

Not at all happy with this company, payments taken from my account well after subscription ceased. No way can I get a refund after many attempts. Given up now!

17/04/2024 Nord have now agreed to refund me to my complete satisfaction.

April 16, 2024    Unprompted review

**Iz Da Kobold**
US · 1 review

Sep 13, 2023



**NordVPN stealing my money**

These guys just decided to steal my money after I cancelled my subscription twice. Just get a free one, its better, and with less garbage practice.

September 11, 2023    Unprompted review

4



**Anthony Matheson**
GB · 7 reviews

Mar 5, 2024

★☆☆☆☆

### I received a fraud alert from my bank...

I received a fraud alert from my bank about 2 attempted debit card payments requested by Nord. I cancelled my subscription over a year ago. Despite this, Nord continues to email me so I have blocked them. I have emailed them to request that they remove me from their mailing list and that they don't attempt to take any more payments. My bank also informed me that they had changed the company name on the payment request slightly from the original one. Sneaky! That's what not the kind of behaviour you expect from a reputable internet security company. That is unless of course they have actually suffered a data breach and my details have been made public and used by someone imitating VPN. My bank has put a block on Nord. We shall see...

March 5, 2024    Unprompted review



**sam**
GB · 94 reviews

Nov 4, 2023

★☆☆☆☆

### STAY AWAY FROM THEM

I had nordvpn for 2 years or so but for most of the time I had to turn it off because it caused many problems. Yesterday they charged me again although I cancelled my subscription a long time ago. Stay away from them

November 4, 2023    Unprompted review



**Dáithí De Búrca**
GB · 1 review

Aug 20, 2023

★☆☆☆☆

### Cancelled Nord VPN a reoccurring...

Cancelled Nord VPN a reoccurring subscription a number of years a go only to find they have been taking 2 charges from credit card with out permission and now they refuse to refund the money they have taken wrongly

August 18, 2023    Unprompted review



I have canceled my account 3 times now with NordVPN, turned off auto-renew, and contacted them politely all 3 times and insisted they refunded my money which was done eventually. Today I had a pending charge from them on my credit card and when I opened their website my account was reactivated and auto renew was turned back on. I had enough and cussed them out, I called Discover Card and filed a fraud claim against them as well as contacted my local district attorney and will be seeking to sue them. There is no way to remove my payment method from their system and I know they will attempt to charge me 4, 5, 6, maybe even 10 more times if I didn't file a lawsuit. Avoid this company at all costs! There is no working phone number to reach anyone and when trying to do a live chat 6 different reps connected and immediately left the chat when they seen that I was being fraudulently charged! Look at my attached pictures at the numerous charges and refunds they put on my card and they are still trying to charge me all the time!

**User's recommendation:** Avoid at all costs!



8.      Nord Security experiences a high rate of chargebacks when consumers, frustrated by Defendants' fraudulent billing scheme, initiate disputes through their credit card companies or other payment processors over unwanted Nord Security transactions. Nord Security has developed

customer service protocols for dealing with customers complaining about unwanted subscription charges. Lagosec directly receives chargeback notifications when consumers dispute those charges as unauthorized, and has received and disregarded a high volume of such notifications.

9.      Nevertheless, despite the clear messages Defendants' customers are sending them, Defendants continue to subject the consuming public to their unfair, deceptive, unlawful fraudulent billing scheme and Defendants continue to reap significant monetary benefits from their unlawful conduct.

10.     Only through a class action can consumers like Plaintiff remedy Defendants' fraudulent billing scheme and Nord Security's unfair, deceptive, and unlawful practices. Because the monetary damages suffered by each customer are small in comparison to the much higher cost a single customer would incur in trying to challenge Defendants' improper conduct, it makes no financial sense for an individual customer to bring his or her own lawsuit. Furthermore, many customers do not realize they are victims of Defendants' unlawful acts and continue to be charged to this day. With this class action, Plaintiff and the classes seek to level the playing field, enjoin Nord Security's unfair, deceptive, and unlawful business practices, and recover the unlawful charges Defendants have imposed on them.

## **JURISDICTION AND VENUE**

11.     This Court has personal jurisdiction over Defendants because they conduct substantial business in Connecticut, have sufficient minimum contacts with this state, and otherwise purposely avail themselves of the privileges of conducting business in Connecticut. The Nord Defendants market and sell products and services in Connecticut and nationwide. Lagosec processes payments from Connecticut consumers and directs its payment processing activities at consumers nationwide, including in Connecticut. Further, the injuries to Connecticut consumers that Plaintiff seeks to prevent through public injunctive relief arise directly from Nord Security's

continuing conduct in Connecticut, including, but not limited to, directing its subscription scheme at Connecticut consumers. Additionally, this Court has personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(b), which provides for nationwide service of process in civil RICO actions, because the ends of justice require that all members of the Nord Enterprise, as defined herein, be brought before this Court.

12.     This Court has jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331 because the action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 ("RICO"). This Court also has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Classes exceed the sum or value of $5,000,000, the Classes have more than 100 members, and diversity of citizenship exists between at least one member of the Classes and Defendants.

13.     To the extent the Court determines that it lacks original jurisdiction over any claim in this action, it may exercise supplemental jurisdiction over such claims under 28 U.S.C. § 1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c)(3). A substantial part of the events giving rise to Plaintiff's claims occurred in this District. Defendants Nordvpn S.A. and Tefincom S.A. are foreign corporations that may be sued in any judicial district in the United States. *Id.*

## PARTIES

15.     Plaintiff John Daddabbo is a citizen of Connecticut.

16.     Plaintiff is a consumer who was victimized by Defendants' unlawful subscription scheme, suffered ascertainable injury in fact and lost money because of the Nord Defendants'

violations of Connecticut consumer protection statutes and the common law, and because of Defendants' RICO violations.

17.     With respect to all actions and decisions relevant to this action, the Nord Defendants, along with non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc., have operated as a single company called "Nord Security." Yet unbeknownst to the ordinary consumer, "Nord Security" is a brand and not a formal corporate entity.

18.     The Nord Defendants, along with non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc., hold themselves out to the public, including Plaintiff, as if a single fictitious entity called "Nord Security" sells the services consumers in Connecticut and the rest of the United States purchase. For example, when a consumer visits www.nordsecurity.com they see a typical company website with the "Nord Security" logo that features "our products" (including one of the products purchased by Plaintiff), "our story," "our team" and "our values." Similarly, when top U.S. venture capital firm Warburg Pincus and others invested $100 million in the Nord Defendants and non-Defendants NordSec Ltd. and Nord Security Inc., "Nord Security" issued a press release describing the funding as an investment in "Nord Security, a global leader in internet privacy and security solutions."[4] This same press release states that NordVPN is "the biggest and most popular VPN service in the world" and that "Nord Security was founded in Lithuania in 2012 by co-founders and co-CEOs Tom Okman and Eimantas Sabaliauskas."[5] Likewise, the "Corporate responsibility" page for "Nord Security" shows pictures of the founders, explains "our mission," and contains links to Nord Security's "corporate responsibility reports" and Nord Security's "Code

---

[4]     Nord Security raised another $100M investment round, NORD SECURITY, https://nordsecurity.com/blog/nord-security-raised-another-100m-investment-round.
[5] *Id.*

of Conduct,"[6] which discusses such topics as expectations for the "Nord Security brand products, including NordVPN, NordPass, NordLocker, and NordLayer."[7]

19.     Defendant Nordvpn S.A. is a Panamanian corporation incorporated under the laws of Panama.[8] Nordvpn S.A.'s principal place of business is in Amsterdam, the Netherlands.[9] Nordvpn S.A. currently "offers" the Nord Defendants and non-Defendants NordSec Ltd. and Nord Security Inc.'s products "NordVPN, NordLocker, and NordPass."[10] NordVPN is one of the products the Nord Defendants and non-Defendants NordSec Ltd. and Nord Security Inc. marketed and sold to Plaintiff in Connecticut. Defendant Nordvpn S.A. also currently operates the Nord Defendants and non-Defendants NordSec Ltd. and Nord Security Inc.'s website, www.nordvpn.com.[11] Nordvpn S.A.'s corporate parents are non-Defendant NordSec B.V., non-Defendant NordSec Ltd., and Cyberswift B.V., which is also one of the corporate parents of non-Defendant NordSec Ltd.[12] Nordvpn S.A. shares an unnamed director with Defendant Tefincom S.A.[13]

20.     Defendant Tefincom S.A. d/b/a NordVPN is a Panamanian corporation incorporated under the laws of Panama.[14] Defendant Tefincom S.A.'s principal place of business is Panama City, Panama.[15] Defendant Tefincom S.A.'s corporate parent is Stichting Raveset.[16]

---

[6] Corporate Responsibility, NORD SECURITY, https://nordsecurity.com/corporate-responsibility.
[7] Code of Conduct, NORD SECURITY, https://res.cloudinary.com/nordsec/image/upload/v1712078877/nord-security-web/corporate/code%20of%20conduct/Nord_Security_Code_of_Conduct.pdf.
[8] *Zeichner v. Nord Security Inc. et al.*, No. 24 Civ 2462 (N.D. Cal.) ("Zeichner"), Dkt. No. 39-1, ¶ 3.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Zeichner*, Dkt. No. 37.
[13] *Zeichner*, Dkt. No. 39-1, ¶ 8.
[14] *Zeichner*, Dkt. No. 39-3, ¶ 3.
[15] *Id.*
[16] *Zeichner*, Dkt. No. 38.

The Nord Defendants and non-Defendants NordSec Ltd. and Nord Security Inc. admit that Defendant Tefincom S.A. was the contracting entity for Connecticut retail consumer VPN services purchased on or before November 15, 2020.[17] Defendant Tefincom S.A. was the original owner of the trademark for "NordVPN."

21.    Non-Defendant NordSec Ltd. is an internet privacy and security company headquartered in London, England.[18] NordSec Ltd. is a private limited liability company organized under the laws of England & Wales.[19] The Nord Defendants and non-Defendants NordSec Ltd. and Nord Security Inc. claim that NordSec Ltd. "once owned the intellectual property of the Nord brand."[20] NordSec Ltd.'s corporate parents are Cyberswift B.V., Cyberspace B.V., and Stalwart Holding B.V.[21] NordSec Ltd. is also an owner of non-Defendant NordSec B.V.,[22] Defendant Nordvpn S.A.,[23] and non-Defendant Nord Security Inc.[24] Public records indicate that NordSec Ltd. is a prior owner of the "NordVPN" trademark.

22.    Non-Defendant NordSec B.V. is an internet privacy and security company headquartered in Amsterdam, the Netherlands.[25] NordSec B.V. is a private limited liability company organized under the laws of the Netherlands.[26] The Nord Defendants and non-Defendants NordSec Ltd. and Nord Security Inc. claim that NordSec B.V. "currently owns the intellectual property of the Nord brand."[27] NordSec B.V.'s corporate parents are NordSec Ltd. and

---

[17] *Zeichner*, Dkt. No. 39-3, ¶ 3.
[18] *Zeichner*, Dkt. No. 39-5, ¶ 3.
[19] *Id.*
[20] *Zeichner*, Dkt. No. 39, at 5.
[21] *Zeichner*, Dkt. No. 35.
[22] *Zeichner*, Dkt. No. 36.
[23] *Zeichner*, Dkt. No. 37.
[24] *Zeichner*, Dkt. No. 27.
[25] *Zeichner*, Dkt. No. 39-2, ¶ 3.
[26] *Id.*
[27] *Zeichner*, Dkt. No. 39, at 5.

two of NordSec Ltd.'s corporate parents, Cyberswift B.V. and Cyberspace B.V.[28] NordSec B.V. is also an owner of Defendant Nordvpn S.A.[29] and Nord Security Inc.[30] The Nord Defendants and non-Defendants NordSec Ltd. and Nord Security Inc.'s website www.nordsecurity.com claims that "Nord Security trademarks, trade names, company names, logos," whether registered or not, "as well as other Nord Brand features (such as Nord Security websites, applications and creative works embodied therein), are the exclusive property of NordSec B.V. ('Nord Security')."[31] NordSec B.V.'s marks include the marks "Nord Security," "NordVPN," "Nord," "NordSec," "NordLocker," and "NordPass." The website Plaintiff used to enroll with Nord Security was the website owned by NordSec B.V. and the Nord Subscription he purchased bore the "Nord Security," "NordVPN," "Nord," and "NordSec" marks owned by NordSec B.V.

23.    Non-Defendant Nord Security Inc. is a Delaware corporation.[32] Nord Security Inc.'s corporate parents are non-Defendant NordSec B.V., non-Defendant NordSec Ltd., and Cyberswift B.V.,[33] which is also a corporate parent of non-Defendants NordSec B.V.[34] and NordSec Ltd.[35] The Nord Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. claim that Nord Security Inc. is not the "Nord Security" that offers services to Connecticut consumers, instead claiming that non-Defendant Nord Security Inc. provides only business-to-business services.[36]

---

[28] *Zeichner*, Dkt. No. 36.
[29] *Zeichner*, Dkt. No. 37.
[30] *Zeichner*, Dkt. No. 27.
[31]    Nord    Security    Trademark    and    Brand    Guidelines,    NORD    SECURITY, https://nordsecurity.com/trademark-policy.
[32] *Zeichner*, Dkt. No. 27.
[33] *Id.*
[34] *Zeichner*, Dkt. No. 36.
[35] *Zeichner*, Dkt. No. 35.
[36] *Zeichner*, Dkt. No. 39, at 5.

24.    At all times pertinent to this action, the finances, policies, and business practices of the Nord Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. are and were dominated and controlled by one another in such a manner that each Nord Defendant and each of non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. has no separate mind, will, identity, or existence of its own and instead operated as mere instrumentalities and alter egos of one another. For example, even though public records and fine print on the www.nordsecurity.com website indicate that non-Defendant NordSec B.V. owns the "NordVPN" trademark, one of the Nord Defendants' other websites states that "NordVPN is owned and operated by nordvpn S.A."[37] Similarly, that same website also states that "[b]ack in 2012, two best friends sought to create a tool for a safer and more accessible internet. Driven by the idea of internet freedom, Tom Okman and Eimantas Sabaliauskas created NordVPN."[38] Tom Okman and Eimantas Sabaliauskas are listed as directors of non-Defendant NordSec Ltd., but their respective LinkedIn pages claim they are co-founders of "Nord Security."[39]

25.    The Nord Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. are so closely related in ownership and management, and each works closely in concert with the others, such that each has become the alter ego of the others, in that, among other things:

      a. The Nord Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. operate and hold themselves out to the public as a single, fictitious entity, Nord Security.

      b. The Nord Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. operate and hold themselves out to the public in such a way that members of the public would be unable to identify and distinguish between one entity and another. For example, a consumer

---

[37] "The founders and owners of NordVPN," NORDVPN.COM, https://support.nordvpn.com/hc/en-us/articles/20911146148113-The-founders-and-owners-of-NordVPN.
[38] *Id.*
[39] *See* https://www.linkedin.com/in/tokmanas/; *see also* https://www.linkedin.com/in/eimis/.

searching the internet for "NordVPN" would find www.nordvpn.com, which is owned and operated by Defendant Nordvpn S.A. but which the Nord Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. represent is the website of the non-existent entity "Nord Security." "Nord Security" is a trademark owned by non-Defendant NordSec B.V. The www.nordsecurity.com website, which the Nord Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. also represent is owned by the brand "Nord Security" similarly lists the various "Nord Security" products, including NordVPN.

c.  The Nord Defendants and non-Defendants NordSec B.V., NordSec Ltd., and Nord Security Inc. do not market themselves independently.

d.  Olga Sinkeviciene, a director of non-Defendant NordSec Ltd., and Ruta Gorelcionkiene, a director of non-Defendant NordSec B.V., are both employees of CEOcorp, a company that "specializes in the incorporation of entities and implementation of corporate structures across diverse jurisdictions."[40]

e.  The Nord Defendants and non-Defendants NordSec B.V., NordSec Ltd., and Nord Security Inc. share employees. For example, the LinkedIn pages of many of the Nord Defendants and non-Defendants NordSec B.V., NordSec Ltd., and Nord Security Inc.'s employees state that these employees work at "Nord Security," even though no such entity exists. When a prospective employee visits Defendant Nordvpn S.A.'s website, www.nordvpn.com, they are redirected to the "careers" subpage of www.nordsecurity.com (https://nordsecurity.com/careers). That page contains various claims and a video about what it is like to work at "Nord Security." Job applicants can apply for "Nord Security" positions available in Lithuania, Germany, Poland, the Netherlands, England, Spain, Japan, and remotely.

f.  When the Nord Defendants and non-Defendants NordSec B.V., NordSec Ltd., and Nord Security Inc. issue press releases, they do so under the name "Nord Security" without identifying or distinguishing between corporate entities.

g.  There is a unified executive team that controls all operational and financial aspects of the Nord Defendants and non-Defendants NordSec B.V., NordSec Ltd., and Nord Security Inc.

---

[40] Services, CEOCORP, https://ceocorp.net/services/.

26.    The alter ego relationship among the Nord Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. is further evidenced by their operation of a corporate structure that, as a practical matter, prevents consumers from identifying which legal entity they are transacting with, which entity holds their payment credentials, and which entity bears legal responsibility for unauthorized charges. As alleged above, the Nord Defendants route consumers between websites owned by different legal entities without disclosure, operate under a fictitious unified brand and—as the Nord Defendants' own admissions in the *Zeichner* litigation reveal—have shifted the "contracting entity" for consumer transactions between legal entities without any consumer-facing notice of those transitions. The direct operational effect of this structure is that the entity that incurs consumer-facing liabilities for unauthorized subscription charges to Connecticut consumers is structurally separated from the entities that hold the assets and revenues generated by the same unified enterprise, insulating the Nord Defendants' business from accountability for their own conduct. Adherence to the fiction of separate corporate identity under these circumstances would permit the Nord Security enterprise to escape liability for a subscription scheme operated for the benefit of the whole enterprise.

27.    Both the Nord Defendants and non-Defendants NordSec B.V., NordSec Ltd., and Nord Security Inc. have been represented by the same counsel in cases filed in North Carolina and California, where non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. were also named as defendants. This same counsel also represents Defendants Nordvpn S.A. and Tefincom S.A. in cases filed in Colorado, Illinois, and Massachusetts, Defendant Nordvpn S.A. in a case filed in North Carolina, and Defendants Nordvpn S.A., Tefincom S.A., and non-Defendant NordSec B.V. in a case filed in New York.

15

28. The Nord Defendants and non-Defendants NordSec B.V., NordSec Ltd., and Nord Security Inc. do business in Connecticut under the name "Nord Security" and interacted with Plaintiff in Connecticut such that Plaintiff's claims described herein arise from Plaintiff's contacts with the Nord Defendants and these non-Defendants in Connecticut.

29. Defendant Lagosec, Inc. is a corporation organized under the laws of the State of Delaware (file number 6607314), incorporated November 7, 2017, with its principal place of business unknown to Plaintiff at this time and subject to discovery. Lagosec, Inc. was established by or at the direction of the Nord Defendants to serve as the United States payment processing vehicle for the Nord Security subscription business. Nord Security's publicly available Terms of Service identify Lagosec, Inc. as the entity that processes payments for residents of the United States. Lagosec receives compensation for its payment processing services in the form of processing fees, a percentage of transaction value, or both, for each charge it processes on behalf of the Nord Defendants. As a result, Lagosec directly and personally benefits from each Nord Security subscription charge it processes, including each unauthorized reactivation charge at issue in this action.

30. Lagosec, Inc. is owned by one or more of the Nord Defendants, by non-Defendant NordSec B.V., by non-Defendant NordSec Ltd., or by entities under common ownership with the Nord Defendants. Lagosec, Inc. processes consumer payment transactions on behalf of the Nord Defendants and appears as the merchant of record—or causes an entity bearing the "Nord" name to appear as the merchant of record—on consumers' credit card and bank statements for Nord Security subscription charges. Lagosec, Inc. directly receives and processes chargeback notifications generated when consumers dispute Nord Security subscription charges as unauthorized.

31.    Any such conduct of Defendant Nordvpn S.A., Defendant Tefincom S.A., Defendant Lagosec, Inc., non-Defendant NordSec B.V., non-Defendant NordSec Ltd., and non-Defendant Nord Security Inc., should be imputed to each other because of the coordinated and mutually dependent manner in which Defendants and non-Defendants operate.

## FACTUAL ALLEGATIONS

32.    Nord Security engages in a practice of unilaterally reactivating lapsed, cancelled or otherwise inactive accounts and resuming billing for automatically renewing subscriptions.

33.    Plaintiff first enrolled in a Nord Subscription on approximately April 4, 2017. Plaintiff was charged again in March 2019. Plaintiff's final charge pursuant to his Nord Subscription took place on approximately April 8, 2019, for a three-year subscription to Nord Security's NordVPN service.

34.    Plaintiff's April 2019 three-year subscription did not renew.

35.    Starting in approximately 2022, Plaintiff began using a VPN service not provided by Nord Security.

36.    Plaintiff did not want his Nord Subscription to renew and took no action to reactivate his account.

37.    On approximately February 18, 2025, Plaintiff received an email from Nord Security with the subject line "Subscription renewal in 30 days," (the "Renewal Email") which is reproduced on the next page:

17



38.     The Renewal Email stated that Plaintiff would be "billed by an automatic payment on March 21st, 2025 unless you cancel before the payment is charged."

39.     The Renewal Email also stated that Plaintiff's "current subscription expires on April 4th, 2025."

40.     Plaintiff, and other reasonable consumers without "current" Nord Subscriptions receiving such emails, reasonably believed that the Renewal Email was a marketing email seeking to have the consumer re-enroll in a Nord Subscription.

41.     Because Plaintiff knew his Nord Subscription was inactive and reasonably believed Nord Security's email was a marketing email, he took no action in response to the Renewal Email.

42.     Nevertheless, on approximately March 20, 2025, Plaintiff was charged $149.88 for a 1-year Nord Subscription. Plaintiff never authorized this charge. This charge was processed

18

through Lagosec, which appears as the merchant of record—or causes an entity bearing the "Nord" name to appear as the merchant of record—on consumer billing statements for Nord Subscription charges and which received and processed the payment instruction from Defendants to charge Plaintiff's stored payment credentials.

43. On approximately February 18, 2026, Plaintiff received an email from Nord Security with the subject line "Subscription renewal: Payment in 30 days." It was not until Plaintiff received this email that he realized that Nord Security had charged him in March 2025.

44. In sum, Nord Security unilaterally and without authorization by Plaintiff reactivated Plaintiff's inactive Nord Subscription and charged him $149.88. Nord Security's practice of reactivating canceled accounts and resuming automatic billing is an unfair and/or deceptive practice in trade or commerce.

45. In addition, the Renewal Email violated Connecticut's automatic renewal law, C.G.S.A. § 42-158ff ("ARL"), which requires businesses that offer automatically renewing subscriptions to clearly and conspicuously disclose certain facts before automatically renewing a consumer's subscription.

46. Nord Security was required to "clearly and conspicuously" disclose "any additional provisions concerning" its renewal term. *Id.* § 42-158ff(b)(1)(B)(v).

47. The Renewal Email stated that Plaintiff would be charged on March 21, 2025 unless he took action to cancel before he was charged. But Plaintiff was charged the day before, on March 20, 2025.

48. Reasonable consumers acting reasonably would not expect Nord Security to charge them for a subscription fee a day earlier than what Nord Security represented in the Renewal Email.

19

49. Nord Security did not disclose its practice of charging consumers one day before the date it represented the charge would occur. This is an additional provision concerning Nord Security's renewal term, and Nord Security's failure to disclose it violates the ARL.

50. The ARL further requires businesses that offer automatically renewing subscriptions to clearly and conspicuously disclose material changes in the terms of automatic renewal provisions before making the material change.

51. Unilaterally reactivating consumers' canceled accounts is a material change to the terms of the automatic renewal provision.

52. Nord Security did not obtain Plaintiff's affirmative consent to treat his lapsed Nord Subscription as subject to automatic renewal. Once Plaintiff's subscription lapsed and he ceased to be an active subscriber, any prior authorization for automatic renewal charges associated with that subscription was no longer operative. By unilaterally reactivating Plaintiff's lapsed account and processing a charge without obtaining new affirmative consent from Plaintiff, Nord Security violated the ARL's requirement that businesses obtain affirmative consent before making an automatic renewal charge. C.G.S.A. § 42-158ff(b)(2)(C). Nor did the Nord Defendants disclose at any time, let alone clearly and conspicuously, that they were reactivating Plaintiff's Nord Subscription. *See id.* § 42-158ff(c).

53. Plaintiff was injured by Nord Security's unfair, deceptive, and unlawful subscription scheme because had Plaintiff known that canceling his account would not be effective to prevent future charges, he would not have enrolled in a Nord Security subscription.

54. Nord Security did not disclose to Plaintiff that it would unilaterally reactivate his Nord Subscription after it lapsed.

20

55. Nord Security's practices with respect to unilaterally reactivating canceled accounts are unfair, deceptive, and unlawful.

56. Nord Security's practices with respect to unilaterally reactivating lapsed, canceled, or otherwise inactive accounts offend public policy because they inject uncertainty into consumers' confidence in being able to cancel automatically renewing subscriptions without being charged again at a future time.

57. Nord Security's practices with respect to unilaterally reactivating lapsed, canceled or otherwise inactive accounts are immoral, oppressive, and unscrupulous because they entrap customers who had successfully canceled their Nord Subscriptions into continuing to pay for such subscriptions.

58. Defendants' practices with respect to unilaterally reactivating lapsed, canceled, or otherwise inactive accounts caused substantial injury to consumers because they saddled consumers with hefty charges for Nord Subscriptions that were never authorized.

59. Plaintiff was injured when Defendants charged him $149.88 for a Nord Subscription he did not want and did not want to pay for.

60. Plaintiff intends to purchase internet security products and services in the future, including from Nord Security, if Defendants' subscription, billing, and cancellation practices are reformed to comply with the law. Plaintiff also faces a real and immediate threat of future unauthorized charges, independent of any future voluntary purchase decision, because Nord Security continues to retain his payment information and has already demonstrated a willingness to use stored payment credentials to charge consumers without authorization.

61. Plaintiff's claims are timely. The conduct giving rise to Plaintiff's claims— including Defendants' unilateral reactivation of Plaintiff's canceled subscription and their charge

21

of $149.88—occurred in March 2025, well within the applicable limitations periods for each count asserted herein. To the extent any earlier conduct by Nord Security is relevant to Plaintiff's claims, the continuing violation doctrine applies because Nord Security's subscription reactivation scheme constitutes a continuous and ongoing course of unlawful conduct, each new instance of which resets the limitations period. Additionally, Nord Security's failure to disclose its reactivation practices prevented Plaintiff from discovering that he had been subjected to Nord Security's unlawful scheme until he received the February 2026 renewal email, and the limitations period is further tolled by the discovery rule for any claims arising from conduct Plaintiff could not reasonably have discovered earlier. With respect to Plaintiff's claims under 18 U.S.C. §§ 1962(c) and 1962(d), the applicable four-year limitations period likewise begins to run when Plaintiff discovered or should have discovered the RICO injury. Plaintiff did not discover and could not reasonably have discovered that Defendants had charged him $149.88 for an unauthorized reactivation until he received the February 2026 renewal email—less than four years before the filing of this complaint. Plaintiff's RICO claims are therefore timely.

## <u>CLASS ACTION ALLEGATIONS</u>

62.     Plaintiff brings this action on his own behalf and additionally, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Classes:

**Connecticut Class:** All Nord Security customers in Connecticut (including customers of companies Nord Security acts as a successor to) with a lapsed, cancelled, or otherwise inactive Nord Subscription who were subsequently charged for a Nord Subscription without having re-enrolled in one, from the earliest allowable date through the date of judgment.

**Nationwide RICO Class:** All Nord Security customers in the United States with a lapsed, cancelled, or otherwise inactive Nord Subscription who were subsequently charged for a

Nord Subscription without having re-enrolled in one, from the earliest allowable date through the date of judgment.

The Connecticut Class and the Nationwide RICO Class are referred to collectively herein as the "Classes."

63.    As alleged throughout this Complaint, the Classes' claims all derive directly from a single course of conduct by Defendants. Defendants have engaged in uniform and standardized conduct toward the Classes and this case is about the responsibility of Defendants, at law and in equity, for their knowledge and conduct in deceiving their customers. Defendants' conduct did not meaningfully differ among individual Class Members in their degree of care or candor, their actions or inactions, or in their false and misleading statements or omissions. The objective facts on these subjects are the same for all Class Members.

64.    Excluded from the Classes are: Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; the non-Defendant Nord Security entities identified herein, including NordSec Ltd., NordSec B.V., and Nord Security Inc., and their respective parents, subsidiaries, affiliates, officers, directors, employees, legal representatives, predecessors, successors, and assignees; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants. Also excluded are federal, state and local government entities; and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

65.    Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition(s) of the Class(es), when Plaintiff files his motion for class certification.

23

66.     Plaintiff does not know the exact size of the Classes since such information is in the exclusive control of Defendants. Plaintiff believes, however, that the Classes encompass thousands of consumers whose identities can be readily ascertained from Nord Security's records. Accordingly, the members of the Classes are so numerous that joinder of all such persons is impracticable.

67.     The Classes are ascertainable because their members can be readily identified using data and information kept by Defendants in the usual course of business and within their control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

68.     Plaintiff is an adequate representative of both Classes. Plaintiff's claims are typical of the claims of both Classes and do not conflict with the interests of any other members of either Class. Plaintiff and the other members of the Classes were subject to the same or similar conduct engineered by Defendants. Further, Plaintiff and members of the Classes sustained substantially the same injuries and damages arising out of Defendants' conduct.

69.     Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Classes.

70.     Questions of law and fact are common to the Classes, and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

  a.  Whether the Nord Defendants' conduct violates the applicable Connecticut consumer protection statutes;

  b.  Whether the Nord Defendants' conduct violates the applicable common law doctrines;

c.  Whether the Nord Defendants were unjustly enriched as a result of their conduct;

d.  Whether Class Members have been injured by Defendants' conduct;

e.  Whether, and to what extent, equitable relief should be imposed on Defendants to prevent them from continuing their unlawful practices; and

f.  The extent of class-wide injury and the measure of damages for those injuries;

g.  Whether Defendants conducted the affairs of an associated-in-fact enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); and

h.  Whether Defendants conspired to do so in violation of 18 U.S.C. § 1962(d).

71.  A class action is superior to all other available methods for resolving this controversy because: (1) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; (2) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct; (3) Defendants have acted or refused to act on grounds generally applicable to all Class Members; and (4) questions of law and fact common to the Classes predominate over any questions affecting only individual Class Members.

72.  With respect to the Nationwide RICO Class specifically, common questions of law and fact predominate because the reactivation scheme was applied to all Class Members through the same standardized conduct: the same form Renewal Email, the same payment processing mechanism through Lagosec, and the same unauthorized charging practice using stored payment

25

credentials from lapsed, canceled, or otherwise inactive Nord Subscriptions. Because the reactivation scheme as applied to the Nationwide RICO Class is inherently fraudulent in its entirety—no consumer who had a lapsed, canceled, or otherwise inactive Nord Subscription and did not re-enroll authorized a reactivation charge—proof of each Class Member's injury does not require individualized inquiry into that Class Member's specific interactions with Defendants. The fact of class membership itself—that a consumer had a lapsed, canceled, or otherwise inactive Nord Subscription, did not re-enroll, and was subsequently charged—establishes injury and causation on a class-wide basis susceptible to common proof. Damages for each member of the Nationwide RICO Class are capable of class-wide calculation using a uniform methodology: the amount of each unauthorized reactivation charge imposed on each Class Member's payment method, as recorded in transaction data maintained by Defendants in the ordinary course of business, trebled pursuant to 18 U.S.C. § 1964(c). Nord Security transmits the same standardized Renewal Email to active subscribers and to consumers whose subscriptions have lapsed or become inactive, without any disclosure that the recipient's account has been unilaterally reactivated or that the recipient has not affirmatively authorized the impending charge.

73.    Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

   a.  Whether Defendants' conduct violates the applicable Connecticut consumer protection statutes;

   b.  Whether Defendants' conduct violates the applicable common law doctrines;

   c.  Whether Defendants were unjustly enriched as a result of their conduct;

   d.  Whether Class Members have been injured by Defendants' conduct;

   e.  Whether, and to what extent, equitable relief should be imposed on Defendants to prevent them from continuing their unlawful practices;

26

f.  Whether Defendants conducted the affairs of an associated-in-fact enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); and

g.  Whether Defendants conspired to do so in violation of 18 U.S.C. § 1962(d).

74. Accordingly, this action satisfies the requirements set forth under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

## RULE 9(B) ALLEGATIONS

75. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

76. To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) of the Federal Rules of Civil Procedure by establishing the following elements with sufficient particularity. The Renewal Email described below and the unauthorized charging practice it represents are standardized communications and practices applied by Defendants uniformly to all members of the Nationwide RICO Class. Plaintiff's own experience is therefore representative of the scheme as applied to each Class Member, and the particularity shown below with respect to Plaintiff's own claim extends to the Class as a whole.

77. **WHO:** The RICO defendants are Nordvpn S.A., Tefincom S.A. d/b/a NordVPN, and Lagosec, Inc. The Nord Defendants are the operators of the Nord Security subscription business and are responsible for the decision to identify lapsed, canceled, or otherwise inactive Nord Subscriptions, treat those subscriptions as subject to automatic renewal notwithstanding a lack of authorization to do so, and transmit payment instructions to Lagosec directing it to charge the stored payment credentials of consumers whose accounts had been unilaterally reactivated. Lagosec is Nord Security's United States payment processor. Lagosec processed the unauthorized reactivation charges pursuant to the Nord Defendants' instructions, received compensation for its payment processing services, appeared as the merchant of record on consumers' billing statements,

27

and received and disregarded systematic chargeback notifications reflecting consumers' rejection of reactivation charges as unauthorized. Defendants and Lagosec conducted the affairs of the Nord Enterprise—an associated-in-fact enterprise comprising of Nordvpn S.A., Tefincom S.A., Lagosec, Inc., NordSec Ltd., NordSec B.V., and Nord Security Inc.—through a pattern of racketeering activity consisting of repeated acts of wire fraud in violation of 18 U.S.C. § 1343.

78.    **WHAT:** Defendants conducted the affairs of the Nord Enterprise through a scheme to defraud by:

a. Identifying consumer accounts that were lapsed, canceled, or otherwise inactive—in Plaintiff's case, a three-year Nord Subscription set to begin in April 2019 with no subsequent payments—and unilaterally treating those accounts as subject to automatic renewal without obtaining any such authorization from the consumer;

b. Transmitting a Renewal Email to each such consumer that, to reasonable consumers including Plaintiff, appeared as a marketing communication seeking re-enrollment rather than as notice of an imminent charge for a Nord Subscription the consumer had never reauthorized. The Renewal Email made material misrepresentations and omissions, including: (1) representing that the consumer had a "current subscription" when no such subscription was in effect; (2) representing a specific charge date that Defendants did not intend to honor, thereby depriving consumers of even the limited opportunity to cancel that the email purported to offer; and (3) failing to disclose that Defendants were treating the consumer's lapsed, canceled, or otherwise inactive account as an active Nord Subscription subject to automatic renewal using payment credentials collected years earlier at the time of the consumer's original enrollment;

c. Transmitting payment instructions to Lagosec across interstate wires directing it to charge the stored payment credentials of each reactivated consumer without that consumer's authorization;

d. Processing each unauthorized reactivation charge through Lagosec notwithstanding actual knowledge, derived from systematic chargeback notifications and consumer complaints on public platforms including Trustpilot, SiteJabber, and Reddit, that those charges were being rejected by consumers as unauthorized; and

e. Developing and maintaining customer service protocols designed to manage—rather than eliminate—consumer complaints about unauthorized reactivation charges, thereby perpetuating the scheme while minimizing its visibility to card networks and regulators.

79.     **WHERE:** The Nord Defendants made the material misrepresentations and omissions described above in the Renewal Email, which was transmitted electronically to Plaintiff and each member of the Nationwide RICO Class at their respective email addresses across interstate wires. The Nord Defendants transmitted payment instructions to Lagosec electronically across interstate wires. Lagosec then processed each unauthorized charge electronically across interstate wires, transmitting the charge to each consumer's financial institution. Each of these communications was transmitted in interstate commerce. In Plaintiff's case, the Renewal Email was transmitted to Plaintiff in Connecticut on approximately February 18, 2025, and the payment instruction and resulting charge were transmitted on approximately March 20, 2025. The Renewal Email was transmitted to Plaintiff again on approximately February 18, 2026.

80.     **WHEN:** Defendants have been conducting the reactivation scheme for years and the scheme is ongoing. With respect to Plaintiff specifically: on approximately February 18, 2025 the Nord Defendants transmitted the Renewal Email to Plaintiff; on approximately March 20, 2025—one day before the date stated in the Renewal Email—the Nord Defendants transmitted a payment instruction to Lagosec directing it to charge Plaintiff $149.88, and Lagosec processed that charge across interstate wires; and on approximately February 18, 2026, Plaintiff received a second Renewal Email confirming the scheme was still in operation. While Plaintiff cannot plead the precise dates of all of Defendants' and Lagosec's uses of interstate wires with respect to other Class Members because that information cannot be alleged without access to Defendants' records, Plaintiff has pled all dates known to him. Defendants have made the same or substantially similar misrepresentations and omissions to all members of the Nationwide RICO Class.

81.     **WHY:** The Nord Defendants—knowing that consumers who had canceled their Nord Subscriptions had not authorized renewal, and knowing from systematic chargeback

29

notifications and public consumer complaints that their reactivation charges were being rejected as unauthorized—nonetheless transmitted Renewal Emails designed to obscure the nature of the impending charge and transmitted payment instructions to Lagosec directing it to charge those consumers' stored payment credentials. Lagosec processed those payment instructions knowing from the volume and pattern of chargeback notifications it received that the charges it was processing were not authorized by the consumers being charged. The Nord Defendants and Lagosec did so with the purpose of extracting subscription revenue from consumers who had not authorized payment, for the monetary benefit of the Nord Enterprise as a whole.

82.    **HOW:** Defendants executed the reactivation scheme as follows. The Nord Defendants identified consumer accounts that were lapsed, canceled, or otherwise inactive. Without obtaining any authorization from those consumers, the Nord Defendants transmitted payment instructions to Lagosec directing it to charge the stored payment credentials associated with those accounts. The Nord Defendants simultaneously transmitted the Renewal Email to each such consumer—a communication formatted and worded to resemble a marketing solicitation seeking re-enrollment or a renewal notice for an active subscription, so that consumers would not understand the nature of the communication until after the charge had been or was about to be processed. In Plaintiff's case, Defendants charged him one day before the date stated in the Renewal Email, ensuring that even a consumer who understood that a charge was forthcoming and attempted to cancel in time could not do so. Lagosec appeared as the merchant of record—or caused an entity bearing the "Nord" name to appear as the merchant of record—on consumers' billing statements, which had the effect of making the unauthorized charge more difficult for consumers to identify and dispute. When consumers did identify and dispute the charges—as evidenced by the high chargeback rate and the volume of public complaints—Lagosec received

30

those chargeback notifications directly and continued to process reactivation charges notwithstanding that actual notice. Defendants responded to consumer complaints by implementing customer service protocols designed to manage the complaints rather than to stop the reactivation scheme, demonstrating that the unauthorized charging was not an isolated error but a known and deliberate feature of the Nord Enterprise. Because this case is brought on behalf of Classes of similarly situated consumers who were subjected to the same standardized reactivation scheme, Plaintiff will provide further details as to individual transactions once discovery is complete.

**COUNT I**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**18 U.S.C. § 1962(c)**
**(On Behalf of Plaintiff and the Nationwide RICO Class Against All Defendants)**

83.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

84.    Plaintiff brings this claim on his own behalf and on behalf of the Nationwide RICO Class.

**(i)    The Nord Enterprise**

85.    Defendants Nordvpn S.A., Tefincom S.A. d/b/a NordVPN, and Lagosec, Inc. are each "persons" within the meaning of 18 U.S.C. § 1961(3).

86.    At all relevant times, as described below, in violation of 18 U.S.C. § 1962(c), Defendants Nordvpn S.A., Tefincom S.A., and Lagosec, together with non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc., conducted the affairs of an associated-in-fact enterprise as that term is defined in 18 U.S.C. §§ 1961(4) (the "Nord Enterprise"). The affairs of the Nord Enterprise affected interstate commerce through a pattern of racketeering activity.

87.    The Nord Enterprise is an ongoing, continuing group or unit of persons and entities associated for the common purpose of generating subscription revenue through the reactivation

31

scheme described herein. For example, in or around February 2025, the Nord Defendants transmitted the Renewal Email to Plaintiff in Connecticut, falsely representing that Plaintiff had a "current subscription" expiring on April 4, 2025 and that he would be charged on March 21, 2025. On or about March 20, 2025—one day before the date stated in the Renewal Email—the Nord Defendants transmitted payment instructions to Lagosec directing it to charge Plaintiff $149.88 for a subscription he had not authorized. Lagosec processed that charge across interstate wires. Plaintiff's subscription had not been active since no later than April 2022. The Nord Enterprise continues to this day: on approximately February 18, 2026, Plaintiff received a second Renewal Email from Nord Security confirming the fraudulent billing scheme remains in operation.

88.     While the members of the Nord Enterprise participate in and are part of the Nord Enterprise, they also have an existence separate and distinct from the Nord Enterprise. The Nord Defendants operate the Nord Security subscription business and are responsible for the decision to reactivate canceled consumer accounts. Lagosec operates as the United States payment processing arm of the Nord Enterprise, appearing as the merchant of record on consumer billing statements— or causing an entity bearing the "Nord" name to appear as the merchant of record—and processing the unauthorized reactivation charges on behalf of the Nord Defendants. Only by acting in concert are the members of the Nord Enterprise able to effectuate the reactivation scheme: the Nord Defendants identify and reactivate canceled accounts and transmit payment instructions; Lagosec processes those payment instructions, collects the unauthorized charges from consumers' accounts, and remits the funds to the Nord Defendants; and the Nord Enterprise as a whole retains the proceeds of the scheme.

89.     The Nord Enterprise has a systemic linkage because the Nord Defendants and Lagosec have contractual relationships, financial ties, and coordinated operational arrangements

that make the fraudulent reactivation scheme possible. Lagosec holds the stored payment credentials associated with Nord Security consumer accounts, and processes charges against those credentials upon receiving payment instructions from the Nord Defendants. Lagosec directly receives chargeback notifications when consumers dispute reactivation charges as unauthorized. Lagosec coordinates the remittance of collected funds to the Nord Defendants pursuant to their prior arrangement. Lagosec was established by or at the direction of the Nord Defendants specifically to serve as the United States payment processing vehicle for the Nord Security subscription business, and its function within the Nord Enterprise is to facilitate the collection of subscription charges—including unauthorized reactivation charges—from United States consumers while insulating the Nord Defendants from direct exposure to the card network consequences of their high chargeback rate. Unlike a mere bilateral merchant-processor relationship, the Nord Defendants and Lagosec operate in a coordinated and mutually dependent manner, with each member of the Nord Enterprise aware of and relying upon the other's role in executing the reactivation scheme. Lagosec's decisions to continue processing reactivation charges notwithstanding systematic chargeback notifications—which are a direct signal that consumers are disputing charges as unauthorized—constitute participation in the operation and management of the Nord Enterprise's affairs, not mere service provision. A payment processor that terminates its relationship upon receipt of systematic chargebacks shuts down the scheme. Lagosec's decision to continue processing is an operational choice that sustains the scheme and goes beyond the rendition of routine processing services.

90.    The members of the Nord Enterprise control and direct the affairs of the Nord Enterprise and use one another as instrumentalities to carry out the reactivation scheme. These practices include: (1) identifying consumer accounts that have lapsed, were canceled or are

33

inactive;   (2) unilaterally reactivating those accounts without consumer authorization; (3) transmitting payment instructions to Lagosec directing it to charge the stored payment credentials of reactivated consumers; (4) sending Renewal Emails designed to appear as marketing communications so that consumers will not recognize the unauthorized charge until after it has been processed; (5) processing unauthorized reactivation charges through Lagosec notwithstanding actual knowledge, derived from systematic chargeback notifications and consumer complaints, that those charges are being rejected by consumers as unauthorized; and (6) developing and maintaining customer service protocols designed to manage—rather than eliminate—consumer complaints about unauthorized reactivation charges, thereby perpetuating the fraudulent billing scheme while minimizing its visibility to card networks and regulators.

91.    The Nord Enterprise is legally distinct from each individual Defendant named herein. The Nord Enterprise comprises six separately incorporated legal entities organized under the laws of multiple jurisdictions. Even if any two members of the Nord Enterprise are affiliated through common ownership, the Nord Enterprise as a whole is independent of any single Defendant. Lagosec, Inc. is owned by one or more of the Defendants, by non-Defendant NordSec B.V., by non-Defendant NordSec Ltd., or by entities under common ownership with Defendants; the precise ownership structure of Lagosec will be confirmed through discovery. Regardless of Lagosec's ownership structure, the Nord Enterprise is sufficiently distinct from any individual Defendant because it encompasses multiple separately incorporated legal entities—including non-Defendants NordSec Ltd. and NordSec B.V., which are corporate parents of the Nord Defendants, and non-Defendant Nord Security Inc.—each organized under the laws of different jurisdictions, each with independent legal existence, and each performing a distinct and non-interchangeable role within the Enterprise. Unlike an enterprise consisting of a single corporation operating through

34

its own subsidiaries under a unified corporate consciousness, the Nord Enterprise spans multiple tiers of an international corporate family, including entities above the named Defendants in the ownership hierarchy whose participation in the Enterprise is independent of any single Defendant's direction or control.

### (ii)    The Predicate Acts

92.    Defendants' systematic scheme to reactivate lapsed, canceled, or otherwise inactive Nord Security subscriptions and charge consumers for those reactivations without authorization, as described in the paragraphs incorporated by reference above, was facilitated by the use of interstate wires in interstate commerce.

93.    As set forth in detail above and below, Defendants' scheme constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), as acts of wire fraud under 18 U.S.C. § 1343. Defendants used interstate wires in violation of 18 U.S.C. § 1343 in furtherance of their scheme to defraud consumers by using the reactivation scheme to obtain money from consumers through false and fraudulent pretenses.

94.    Through interstate wires, the Nord Defendants transmitted Renewal Emails containing material misrepresentations and omissions to Plaintiff and members of the Nationwide RICO Class, transmitted payment instructions to Lagosec directing it to charge consumers' stored payment credentials without authorization and accepted the proceeds of those unauthorized charges. Lagosec processed those payment instructions and transmitted the resulting charges to consumers' financial institutions across interstate wires, notwithstanding actual knowledge derived from systematic chargeback notifications that those charges were being disputed by consumers as unauthorized. Each Renewal Email, each payment instruction, each unauthorized

charge processed, and each chargeback notification received and disregarded in furtherance of continued processing constituted a separate act of wire fraud under 18 U.S.C. § 1343.

95.     The Nord Defendants had a duty to disclose the material facts omitted from the Renewal Email, arising both from the affirmative disclosure obligations imposed by applicable consumer protection law including the Connecticut ARL, and from the nature of the Renewal Email itself, which by purporting to inform Plaintiff of an upcoming charge undertook an obligation to do so accurately and completely. The Nord Defendants' failure to discharge that duty rendered each Renewal Email a fraudulent communication within the meaning of 18 U.S.C. § 1343.

96.     Defendants' omissions and misrepresentations were material to Plaintiff and the members of the Nationwide RICO Class. Had the Nord Defendants disclosed that they were treating lapsed, cancelled, or otherwise inactive accounts as active subscriptions subject to automatic renewal, or had Lagosec declined to process payment instructions it knew from systematic chargeback notifications were being disputed as unauthorized, Plaintiff and the Nationwide RICO Class would not have been charged for subscriptions they did not authorize. Each of these omissions and misrepresentations constituted an act of wire fraud for purposes of 18 U.S.C. § 1343.

97.     Additionally, by using internet transmissions to communicate false and misleading information about the reactivation scheme to consumers and to process payment instructions in furtherance of the scheme, Defendants engaged in repeated acts of wire fraud in violation of 18 U.S.C. § 1343.

36

98.    In pursuing the reactivation scheme, Defendants knowingly and fraudulently concealed and omitted material information from Plaintiff and members of the Nationwide RICO Class.

99.    The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c). In particular, each Renewal Email, each payment instruction, and each unauthorized charge processed through Lagosec was a separate act of racketeering activity. Further, Plaintiff has been subjected to Defendants' deception for a period spanning more than one year, and the scheme has been ongoing for years across thousands of consumers.

100.    All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Nord Enterprise. The racketeering acts committed by the Nord Enterprise employed a similar method (the Renewal Email followed by an unauthorized charge processed through Lagosec), were related (all in furtherance of the reactivation scheme), had a similar purpose (to extract subscription revenue from consumers who had not authorized payment), involved the same participants (the Nord Defendants and Lagosec), and resulted in similar harm to Plaintiff and members of the Nationwide RICO Class (unauthorized charges for subscriptions that were lapsed, canceled, or otherwise inactive). The pattern of racketeering activity consists of the repeated commission of the reactivation scheme against multiple consumers whose Nord Subscriptions were lapsed, canceled, or otherwise inactive, each reactivation constitutes a distinct fraudulent act in its own right. Because this case is brought on behalf of a class of similarly situated consumers who were subjected to the reactivation scheme, Plaintiff will provide further details once discovery is complete. While Plaintiff cannot plead the precise dates

37

of all of Defendants' uses of interstate wires because this information cannot be alleged without access to Defendants' records, Plaintiff has pled all dates known to him.

101. The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity. The reactivation scheme is centered around the Nord Defendants' transmission of Renewal Emails to consumers whose Nord Subscriptions were lapsed, canceled, or otherwise inactive, and Lagosec's processing of the resulting unauthorized charges, and is an ongoing wrongful scheme that has been repeated across thousands of consumers for years. There are many complaints on the internet and on platforms including Trustpilot, SiteJabber, and Reddit from consumers who have been subjected to the reactivation scheme. The scheme was ongoing as of February 18, 2026, when Plaintiff received a second Renewal Email from Nord Security.

102. As a direct and proximate result of these violations of 18 U.S.C. § 1962(c), Plaintiff and members of the Nationwide RICO Class have suffered substantial damages and been injured in their business or property by the predicate acts which make up Defendants' pattern of racketeering activity comprising the reactivation scheme. Defendants are liable to Plaintiff and members of the Nationwide RICO Class for treble damages, together with all costs of this action, plus reasonable attorneys' fees and costs under 18 U.S.C. § 1964(c).

**COUNT II**
**RICO CONSPIRACY**
**18 U.S.C. § 1962(d)**
**(On Behalf of Plaintiff and the Nationwide RICO Class Against All Defendants)**

103. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

104. Plaintiff brings this claim on his own behalf and on behalf of each member of the Nationwide RICO Class.

105.    As set forth in the paragraphs incorporated by reference above, in violation of 18 U.S.C. § 1962(d), Defendants Nordvpn S.A., Tefincom S.A. d/b/a NordVPN, and Lagosec, Inc. conspired to violate the provisions of 18 U.S.C. § 1962(c).

106.    As set forth in the paragraphs incorporated by reference above, Defendants Nordvpn S.A., Tefincom S.A. d/b/a NordVPN, and Lagosec, Inc., having participated in and been aware of the affairs of the Nord Enterprise, were aware of the nature and scope of the Enterprise's unlawful reactivation scheme, and all agreed to participate in it. The Nord Defendants agreed to identify and reactivate canceled consumer accounts, transmit unauthorized payment instructions to Lagosec, and send Renewal Emails designed to obscure the unauthorized nature of the charges. Lagosec agreed to process those payment instructions notwithstanding actual knowledge, derived from systematic chargeback notifications, that the charges being processed were being disputed by consumers as unauthorized.

107.    As a direct and proximate result of these violations of 18 U.S.C. § 1962(c) and 1962(d), Plaintiff and members of the Nationwide RICO Class have suffered substantial damages and been injured in their business or property by the predicate acts which make up Defendants' pattern of racketeering activity comprising the reactivation scheme. Defendants are liable to Plaintiff and members of the Nationwide RICO Class for treble damages, together with all costs of this action, plus reasonable attorneys' fees and costs under 18 U.S.C. § 1964(c).

**COUNT III**
**CONNECTICUT UNFAIR TRADE PRACTICES ACT, C.G.S.A. §§ 42-110a, ET SEQ.**
**(On Behalf of Plaintiff and the Connecticut Class Against the Nord Defendants)**

108.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

109.    Plaintiff brings this claim under C.G.S.A. § 42-110g on his own behalf and on behalf of each member of the Connecticut Class.

110. Connecticut's consumer protection statute prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." C.G.S.A. § 42-110b(a).

111. Because it is engaged in the "advertising," "sale," "offering," and "distribution" of "services," Nord Security is engaged in trade and commerce under the definition established in C.G.S.A. § 42-110a(4).

112. The Nord Defendants have engaged in, and continue to engage in, unfair or deceptive acts or practices in violation of C.G.S.A. § 42-110b(a), including:

 a. Unilaterally reactivating lapsed, canceled, or otherwise inactive accounts and resuming billing for those Nord Security subscriptions;

 b. Failing to clearly and conspicuously disclose the additional provision concerning Nord Security's renewal term that Nord Security would charge consumers one day before the date it represented such charges would occur; and

 c. Making the material change to its automatic renewal provision of unilaterally reactivating canceled accounts without clearly and conspicuously disclosing that material change.

113. The above unfair and deceptive acts and practices by Nord Security involved material omissions of existing or past facts that Nord Security had a duty to disclose, and affirmative misrepresentations.

114. Nord Security knew or should have known that the above unfair and deceptive acts and practices were material omissions, misrepresentations, or were otherwise deceptive or unfair.

115. Nord Security knew or should have known that the conduct outlined above has the capacity or tendency to deceive or mislead a reasonable consumer, and that the conduct outlined above has the effect of deceiving or misleading a reasonable consumer in material respects.

116. The Renewal Email exemplifies this deception: it informed Plaintiff that he would be "billed by an automatic payment on March 21st, 2025 unless you cancel before the payment is charged," and that his "current subscription expires on April 4th, 2025." A consumer who had not

maintained an active Nord Security subscription for approximately three years, and who had been using a competing service, would reasonably interpret this email as a marketing communication seeking to induce re-enrollment, not as notice of an imminent charge against a subscription he had never reauthorized. Nord Security's failure to disclose that it was treating Plaintiff's lapsed account as an active subscription subject to automatic renewal, combined with its use of renewal language that obscured rather than clarified the nature of the charge, rendered the communication deceptive to a reasonable consumer. Nord Security charged Plaintiff one day before the date stated in the Renewal Email, further demonstrating that the communication did not accurately represent the transaction Nord Security intended to execute.

117. The aforementioned acts and practices are continuing, unconscionable and deceptive and are: (1) contrary to the public policy of Connecticut, which aims to protect consumers; (2) immoral, unethical, oppressive, and unscrupulous; and (3) cause substantial injury to consumers.

118. Nord Security's acts and practices are immoral, unethical, oppressive, and unscrupulous within the meaning of the unfairness standard because Nord Security continued to reactivate lapsed, canceled, or otherwise inactive accounts and charge consumers for unwanted subscriptions with actual knowledge that its conduct was unauthorized. As alleged above, Nord Security received droves of complaints from consumers on public platforms including Trustpilot, SiteJabber, and Reddit, experienced a high rate of chargebacks reflecting consumers' rejection of its charges as unauthorized, and developed internal customer service protocols specifically designed to manage complaints about unwanted subscription charges. A company that continues to impose unauthorized charges on consumers after receiving this volume of complaints and chargebacks, and that responds by developing protocols to manage rather than eliminate the

41

problem, is not engaged in an isolated billing error—it is engaged in a deliberate and knowing scheme to extract money from consumers who have not authorized payment. Such conduct is by its nature oppressive and unscrupulous. It also causes substantial injury to consumers, who are saddled with charges for subscriptions they canceled, often without realizing they have been charged until they receive a subsequent renewal notice, as happened to Plaintiff here.

119. Nord Security's unfair, deceptive, and unlawful acts and practices would have been material to any potential consumer's decision to purchase a Nord Security subscription, or take action in response to an email regarding renewal of a canceled Nord Security subscription.

120. Nord Security's acts and practices are unfair, unconscionable, and outside the norm of reasonable business practices.

121. As a direct and proximate result of Nord Security's unfair, deceptive, and unlawful acts and practices, Plaintiff and Class Members suffered and continue to suffer an ascertainable loss of monies, including subscription fees for lapsed, canceled, or otherwise Nord Security subscriptions.

122. Plaintiff and Class Members have no adequate remedy at law for the equitable remedies for this claim. Plaintiff pleads the equitable relief for this claim in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

123. Plaintiff and the Connecticut Class do not have an adequate remedy at law because damages alone will not stop Nord Security's unfair, deceptive, and unlawful business acts and practices. Damages will only address past injuries visited on Plaintiff and the Connecticut Class. Only injunctive relief can prevent any future harm. For example, Nord Security could be required to implement new business practices to halt unilateral reactivations of canceled subscriptions and to make ARL-compliant representations about its renewal payments. Without such relief, Plaintiff

and the Connecticut Class could be subjected to further unauthorized payments for canceled subscriptions and without such remedies Plaintiff and the Connecticut Class could not trust that Nord Security's automatic renewal practices were lawful or that they would not lead to unwanted and unlawful charges. Without an equitable remedy, it would be difficult to know whether Nord Security had ceased its unfair, deceptive, and unlawful subscription scheme.

124.    Plaintiff and the Connecticut Class also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below—namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and that restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered by Plaintiff and the Connecticut Class, equitable restitution is appropriate and Plaintiff pleads it in the alternative to any available legal remedies.

125.    The scope of equitable relief available under CUTPA is broader than what damages alone can provide. Unlike damages, which are constrained by traditional legal principles, the Court's discretion in fashioning equitable relief is expansive and can be tailored to the specific nature of the harm and the defendant's conduct. Thus, restitution would allow recovery even when normal considerations associated with damages would not. Restitution (and other equitable remedies) are available under CUTPA. *See, e.g.*, *Bartolotta v. Simplicity Fin. Distribs.*, No. X03HHDCV186103636S, 2020 WL 2060554, at *7 (Sup. Ct. Conn. Mar. 18, 2020); *see also Bailey Emp. Sys., Inc. v. Hahn*, 545 F. Supp. 62, 73 (D. Conn. 1982) ("damages under [CUTPA] should be measured according to a restitution formula"). These features of equitable restitution

make it a meaningfully different and more complete remedy than damages, confirming that legal remedies alone are inadequate to fully redress the injuries at issue here. For example, if it were determined that damages have to account for any "value" Plaintiff and the Connecticut Class received by using their reactivated Nord Security subscriptions, restitution would be available for the full amount of unauthorized charges without any such offset. That result is not available through damages, confirming that equitable restitution provides meaningfully greater relief.

126.    As a result of the Nord Defendants' unfair, deceptive, and unlawful acts and practices, Plaintiff and Connecticut Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their actual damages, equitable relief, costs, attorney's fees, and punitive damages, all of which are pleaded in the alternative to one another to the extent any such remedies are found to be inconsistent. C.G.S.A. §§ 42-110g(a), (d).

**COUNT IV**
**CONVERSION**
**(On Behalf of Plaintiff and the Connecticut Class Against All Defendants)**

127.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

128.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Connecticut Class.

129.    The money in Plaintiff's and the Connecticut Class's respective bank accounts, internet payment accounts, and/or credit cards belongs to Plaintiff and the Connecticut Class.

130.    Defendants deprived Plaintiff and the Connecticut Class of this money for an indefinite time by knowingly and intentionally making unauthorized charges to their bank accounts, internet payment accounts, and/or credit cards for Nord Subscriptions.

131.    The charge at issue was not authorized by any contract between Plaintiff and Defendants. Plaintiff's Nord Security subscription expired no later than April 2022. Plaintiff did not renew, did not re-enroll, and did not enter into any new agreement with Defendants after that

date. By March 2025, no contractual relationship between Plaintiff and Defendants was in effect. Defendants' possession of Plaintiff's payment credentials from a lapsed Nord Subscription does not constitute authorization to charge those credentials years after the subscription expired.

132.    Plaintiff and the Connecticut Class have been damaged by Defendants' wrongful taking and/or possession of such money from their bank accounts, internet payment accounts, and/or credit cards in an amount that is capable of identification through Defendants' records.

133.    By reason of the foregoing, Defendants are liable to Plaintiff and the Connecticut Class for conversion in an amount to be proved at trial.

## COUNT V
## CIVIL THEFT, C.G.S.A. § 52-564
### (On Behalf of Plaintiff and the Connecticut Class Against the Nord Defendants)

134.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

135.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Connecticut Class.

136.    The money in Plaintiff's and the Connecticut Class's respective bank accounts, internet payment accounts, and/or credit cards belongs to Plaintiff and the Connecticut Class.

137.    The Nord Defendants deprived Plaintiff and the Connecticut Class of this money for an indefinite time by knowingly and intentionally making unauthorized charges to their bank accounts, internet payment accounts, and/or credit cards for Nord Subscriptions.

138.    The Nord Defendants' conduct was unauthorized. Plaintiff and the Connecticut Class never consented to the Nord Defendants' taking of this money from their bank accounts, internet payment accounts, and/or credit cards.

139.    The Nord Defendants acted with intent to deprive Plaintiff and the Connecticut Class of this money. The Nord Defendants' intent is evidenced by the following: (1) the Nord Defendants unilaterally reactivated inactive, canceled, or lapsed accounts using payment

45

information consumers had provided years earlier, without any affirmative act of re-enrollment by those consumers; (2) the Nord Defendants were on actual notice that their reactivation scheme was generating unauthorized charges, as consumers complained directly to Nord Security and on public platforms including Trustpilot, SiteJabber, and Reddit; (3) The Nord Defendants experienced a high rate of chargebacks—initiated by consumers disputing Nord Security transactions through their credit card companies and payment processors—which are a direct and well-understood signal to a merchant that consumers are rejecting charges as unauthorized; (4) despite this actual notice, the Nord Defendants developed internal customer service protocols specifically designed to handle complaints about unauthorized subscription charges, demonstrating that the unauthorized charging was not an isolated error but a known and managed feature of Defendants' business operations; and (5) the Nord Defendants continued the reactivation scheme notwithstanding this actual knowledge, demonstrating that the deprivation of consumers' funds was deliberate, not inadvertent.

140.    Plaintiff and the Connecticut Class have been damaged by Defendants' wrongful taking and/or possession of such money from their bank accounts, internet payment accounts, and/or credit cards in an amount that is capable of identification through Defendants' records.

141.    By reason of the foregoing, the Nord Defendants are liable to Plaintiff and the Connecticut Class for civil theft in an amount to be proved at trial.

142.    Due to the Nord Defendants' civil theft, Plaintiff and the Connecticut Class are entitled to treble damages.

## COUNT VI
### UNJUST ENRICHMENT
**(Pled in the Alternative to Counts III, IV, and V as Against the Nord Defendants, and in the Alternative to Count VII—On Behalf of Plaintiff and the Connecticut Class Against All Defendants)**

143.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

144. Plaintiff brings this claim on his own behalf and on behalf of each member of the Class.

145. As a result of their unjust conduct, Defendants have been unjustly enriched.

146. By reason of Defendants' wrongful conduct, Defendants have benefited from receipt and maintenance of improper funds, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

147. Lagosec received a direct financial benefit from each unauthorized reactivation charge it processed in the form of processing fees, a percentage of transaction value, or both. Lagosec's receipt and retention of that compensation—derived directly from charges that were unauthorized—constitutes unjust enrichment at Plaintiff's and the Connecticut Class's expense under circumstances in which equity and good conscience do not permit Lagosec to retain those benefits

148. Defendants have not paid Plaintiff and the Connecticut Class for the benefits Nord Security obtained.

149. The failure of payment was to Plaintiff's and the Connecticut Class's detriment.

150. Plaintiff and other Connecticut Class Members have no adequate remedy at law for this claim. Plaintiff pleads this claim in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

151. Plaintiff and the Connecticut Class do not have an adequate remedy at law because damages alone will not stop Defendants' unfair, deceptive, and unlawful business acts and practices. Damages will only address past injuries visited on Plaintiff and the Connecticut Class. Only injunctive relief can prevent any future harm. For example, Defendants could be required to implement new business practices to halt unilateral reactivations of canceled subscriptions and to

47

make ARL-compliant representations about its renewal payments. Without such relief, Plaintiff and the Connecticut Class could be subjected to further unauthorized payments for canceled subscriptions and without such remedies Plaintiff and the Connecticut Class could not trust that Defendants' automatic renewal practices were lawful or that they would not lead to unwanted and unlawful charges. Without an equitable remedy, it would be difficult to know whether Nord Security had ceased its unfair, deceptive, and unlawful subscription scheme.

152.    Plaintiff and the Connecticut Class also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below—namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and that restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered by Plaintiff and the Connecticut Class, equitable restitution is appropriate and Plaintiff pleads it in the alternative to any available legal remedies.

153.    The scope of restitution under this claim is broader than what damages alone can provide. Unlike damages, which are constrained by traditional legal principles, the Court's discretion in fashioning equitable relief is expansive and can be tailored to the specific nature of the harm and the defendant's conduct. Thus, restitution would allow recovery even when normal considerations associated with damages would not. These features of equitable restitution make it a meaningfully different and more complete remedy than damages, confirming that legal remedies alone are inadequate to fully redress the injuries at issue here. For example, if it were determined that damages have to account for any "value" Plaintiff and the Connecticut Class received by using

48

their reactivated Nord Security subscriptions, restitution would be available for the full amount of unauthorized charges without any such offset. That result is not available through damages, confirming that equitable restitution provides meaningfully greater relief.

154.    As a result of Defendants' conduct it would be unjust and/or inequitable for Defendants to retain the benefits of its conduct without restitution to Plaintiff and the Connecticut Class. Accordingly, Defendants must account to Plaintiff and the Connecticut Class for their unjust enrichment.

**COUNT VII**
**MONEY HAD AND RECEIVED**
**(Pled in the Alternative to Counts III, IV, and V as Against the Nord Defendants, and in the Alternative to Count VI—On Behalf of Plaintiff and the Connecticut Class Against All Defendants)**

155.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

156.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Connecticut Class.

157.    Defendants received payments from Plaintiff and from each member of the Connecticut Class.

158.    Plaintiff and each member of the Connecticut Class are free from any moral or legal obligation to make the payments.

159.    Defendants, in equity and good conscience, are not entitled to the money.

160.    In connection with each unauthorized reactivation charge, Lagosec received into its accounts the full amount charged to each Class Member's payment method, including Plaintiff's $149.88, before remitting the net proceeds to the Nord Defendants. Lagosec thus received money belonging to Plaintiff and the Connecticut Class. In equity and good conscience, Lagosec is not entitled to retain any portion of those funds, including the processing fees or percentage of transaction value it retained from each unauthorized charge.

49

161.    Plaintiff and other Connecticut Class Members have no adequate remedy at law for this claim. Plaintiff pleads this claim in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

162.    Plaintiff and the Connecticut Class do not have an adequate remedy at law because damages alone will not stop Nord Security's unfair, deceptive, and unlawful business acts and practices. Damages will only address past injuries visited on Plaintiff and the Connecticut Class. Only injunctive relief can prevent any future harm. For example, Nord Security could be required to implement new business practices to halt unilateral reactivations of canceled subscriptions and to make ARL-compliant representations about its renewal payments. Without such relief, Plaintiff and the Connecticut Class could be subjected to further unauthorized payments for canceled subscriptions and without such remedies Plaintiff and the Connecticut Class could not trust that Nord Security's automatic renewal practices were lawful or that they would not lead to unwanted and unlawful charges. Without an equitable remedy, it would be difficult to know whether Defendants had ceased its unfair, deceptive, and unlawful subscription scheme.

163.    Plaintiff and the Connecticut Class also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below—namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and that restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered by Plaintiff and the Connecticut Class, equitable restitution is appropriate and Plaintiff pleads it in the alternative to any available legal remedies.

164.     The scope of restitution under this claim is broader than what damages alone can provide. Unlike damages, which are constrained by traditional legal principles, the Court's discretion in fashioning equitable relief is expansive and can be tailored to the specific nature of the harm and the defendant's conduct. Thus, restitution would allow recovery even when normal considerations associated with damages would not. These features of equitable restitution make it a meaningfully different and more complete remedy than damages, confirming that legal remedies alone are inadequate to fully redress the injuries at issue here. For example, if it were determined that damages have to account for any "value" Plaintiff and the Connecticut Class received by using their reactivated Nord Security subscriptions, restitution would be available for the full amount of unauthorized charges without any such offset. That result is not available through damages, confirming that equitable restitution provides meaningfully greater relief.

165.     Plaintiff, on behalf of himself and the members of the Connecticut Class, seeks the return of the money in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)     Issue an order certifying the Classes defined above, appointing the Plaintiff as Class representative, and designating Bryson, Harris, Suciu, & Demay, PLLC, Wittels McInturff Palikovic, and Milberg LLC as Class Counsel;

(b)     Find that Defendants have committed the violations of law alleged herein;

(c)     Determine that Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Class;

(d)     Enter an order granting all appropriate relief including injunctive relief on behalf of the Class under the applicable laws;

(e)     Render an award of treble damages pursuant to 18 U.S.C. § 1964(c) on behalf of Plaintiff and the Nationwide RICO Class;

(f)      Render an award of compensatory damages of at least $50,000,000, the exact amount of which is to be determined at trial;

(g)      Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

(h)      Declare that Defendants have committed the violations of law alleged herein;

(i)      Render an award of punitive damages;

(j)      Enter judgment including interest, reasonable attorneys' fees, costs, and expenses, including attorneys' fees pursuant to 18 U.S.C. § 1964(c); and

(k)      Grant all such other relief as the Court deems appropriate.


Dated: April 10, 2026

**MILBERG LLC**

*/s/ Sanford P. Dumain*
Sanford P. Dumain (CT Bar No. 08138)
100 Garden City Plaza
Garden City, New York 11530
Tel:    (212) 594-5300
sdumain@milberg.com

**BRYSON HARRIS SUCIU & DEMAY PLLC**
Scott C. Harris*
900 W. Morgan Street
Raleigh, North Carolina 27603
Tel:    919-600-5003
sharris@brysonpllc.com

**WITTELS MCINTURFF PALIKOVIC**
Ethan D. Roman*
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel:    (914) 775-8862
edr@wittelslaw.com

* *Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and the Proposed Class*

52